IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CODY R.,                              )
                                      )
            Plaintiff,                )        Case No. 7:22-cv-00662
                                      )
v.                                    )        **MEMORANDUM OPINION**
                                      )
MARTIN O'MALLEY,                      )        By:    Hon. Thomas T. Cullen
Commissioner of Social Security,      )               United States District Judge
                                      )
            Defendant.                )

Plaintiff Cody R. ("Cody") filed suit in this court seeking review of the Commissioner of Social Security's ("Commissioner") final decision denying his claim for Child Insurance Benefits ("CIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 401–434, and Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1385.[1] Cody primarily suffers from stage 4 chronic kidney disorder, glomerulonephritis, and anxiety. On review of his application for CIB and SSI, the Commissioner (through an administrative law judge ("ALJ")) concluded that, despite his limitations, Cody could still perform a range of sedentary work. Cody challenges that conclusion but, after careful review of the record, the court finds that the ALJ's decision is supported by substantial evidence and will be affirmed.

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Under Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of the Commissioner of Social Security or any vacancy in such office.").

## I.  STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991)).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his past relevant work (if any) based on his residual functional capacity; and, if not (5) whether he can perform other work. See *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.  PROCEDURAL HISTORY AND RELEVANT EVIDENCE

On June 26, 2020, Cody filed an application for CIB and protectively filed an application for SSI, alleging disability beginning on August 20, 2013, the date he was diagnosed with stage IV kidney disease and glomerulonephritis. (*See* R. 230–250; 419.) At the time, he alleged disability based on his chronic kidney disease, hypertension, anxiety disorder, chronic fatigue, back and neck pain, headaches, and mood swings caused by his required medications. (*See* R. 82.) His application was denied initially and upon reconsideration. (R. 82–137.) Cody sought review of those decisions and, along with his counsel, appeared before ALJ David Lewandowski on February 17, 2022. (R. 49–80.) After considering the relevant medical

evidence, Cody's medical records (including those submitted after the hearing), and the testimony of Vocational Expert Samuel Edelmann, the ALJ issued an unfavorable decision on April 13, 2022. (R. 20–43.) In summary, the ALJ concluded that Cody suffered from several severe impairments but that he retained the residual functional capacity to perform sedentary work with additional limitations. Because there exist a significant number of jobs in the national economy that an individual with Cody's limitations could perform, the ALJ determined that Cody was not disabled within the meaning of the Act.

## A.   Legal Framework

A claimant's residual functional capacity ("RFC") is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the

record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"— including those that the ALJ found 'non-severe'—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023). *See Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

## B. Medical Evidence

In August 2013, Cody presented to LewisGale Medical Center in Salem, Virginia, complaining of "palpitations and fatigue." (R. 419.) In other words, his heart was "racing" and he had chest pains; he thought he was having a panic attack. (R. 505.) His blood work revealed abnormal levels of creatinine, and he was admitted with a referral to a nephrologist. Further

blood work and a renal biopsy were performed,[2] and Cody was diagnosed with chronic glomerulonephritis and stage IV kidney disease. (R. 419.)

At a follow-up appointment on September 11, 2013, Cody met with Dr. Susan Guelich at Valley Nephrology Associates. He presented as "somewhat anxious, especially about [his] new diagnosis and about his health in general." (R. 506.) His blood pressure ("BP") was 146/94, his body mass index ("BMI") was 18.6, and his "[e]stimated GFR" ("eGFR") was "27.39 ml/min."[3] (R. 506–07.) Cody was assessed as suffering from hypertension, glomerulonephritis, renal failure, and proteinuria. (R. 507.) He was prescribed Atenolol for hypertension and referred to "psychiatry for evaluation and treatment of possible depressed mood, with new added stress of kidney failure diagnosis." (R. 508.)

On September 16, 2013, Cody went to urgent care and saw Dr. Mortlock at LewisGale, complaining of anxiety. (R. 446, 501.) He was prescribed Klonopin and instructed to follow up with Dr. Daugherty in 1–2 weeks. (R. 446.)

Cody saw Dr. Guelich for a follow-up on September 30; his chief complaint was "just . . . to find out about kidney biopsy and medication." (R. 501.) He reported that he had stopped the Atenolol because he believed it was exacerbating his anxiety and making him feel "panicky." (*Id.*) He further reported that the Klonopin "seems to help" those symptoms. (*Id.*)

---

[2] Results of the biopsy revealed that Cody had "mesangioproliferative glomerulopathy," severe "tubular atrophy and interstitial fibrosis," and moderate "arterial sclerosis." (R. 337.)

[3] "The glomerular filtration rate (GFR) shows how well the kidneys are filtering." A GFR above 60 is in the "normal range." A GFR between 15–60 indicates kidney disease, and a GFR of less than 15 indicates kidney failure. National Kidney Foundation, *Estimated Glomerular Filtration Rate (eGFR)*, available at https://www.kidney.org/atoz/content/gfr#results (last accessed March 13, 2024.)

At the time, he had not scheduled a follow up with psychiatry as recommended at his prior appointment. Cody's eGFR at this appointment was 27.70 ml/min. (R. 502.)

Cody saw Dr. Guelich again on October 28. He reported that he was doing well and had no new complaints. He also reported that the Klonopin[4] was "helping a great deal with his panic attacks." (R. 498.) Cody still had not made an appointment with a psychiatrist, however. Dr. Guelich noted that Cody creatinine "remains stable, and is actually slightly improved" from its initial check. (R. 500.) His eGFR at that appointment was 29.16 ml/min. (*Id.*)

On November 11, 2013, Cody saw Dr. Keith at the University of Virginia for an evaluation for a possible kidney transplant. Cody reported that he had "occasional" migraines and that he "occasionally" experiences chest pain and tingling in his left arm. (R. 336.) His strength and sensation were normal in all his extremities. Dr. Keith calculated his GFR at 29 and advised Cody that he would not be a candidate for kidney transplant until his GFR "dips below 20." (*Id.*) He also advised him that, once he underwent a transplant, he would need to be on immunosuppressants for life. (*Id.*)

Cody returned to Dr. Guelich for a follow-up on December 9. (R. 495–497.) Cody reported that he was "doing fairly well," that his meeting with Dr. Keith had "put [his] mind at ease," and that he had "[n]o other new concerns." (R. 495.) His eGFR was 13.60 ml/min, and his creatinine was "significantly elevated." (R. 497.) After receiving the lab results, Dr.

---

[4] In the medical records, Dr. Guelich referred to the "clonazepam," the generic name for Klonopin. (*E.g.*, R. 495.)

Guelich called Cody's mother and left word that he should "stop lisinopril, increase fluid intake, and come in for repeat labs in 3 days." (*Id.*)

On January 2, 2014, Cody went to the emergency department ("ED") at LewisGale Medical Center, complaining of thoracic pain that was radiating to his chest. (R. 394.) His BP was 147/75 and he was "alert" and "oriented x3." (R. 396.) Chest x-rays revealed no acute issues, he was diagnosed with pleurisy, and he was discharged in stable condition. Labs taken at the time indicate Cody's GFR was 26.1. (R. 396–98.)

When Cody saw Dr. Guelich again on March 5, he reported that his BP had been "spiking a few times a week" at home, but he was otherwise doing well and had no new complaints. (R. 491.) His BP was 133/83 and his eGFR was 31.94 ml/min. (R. 493.) Dr. Guelich noted that his creatinine was "stable" but "a little bit too high to add an ACE inhibitor[5] at this point." (R. 494.)

In May, Cody denied any new complaints at his appointment with Dr. Guelich. (R. 488.) He reported that he had tried "lisinopril in the past," but that it made him feel "disconnected" and he did not want to go back on it. (R. 488.) His BP was 136/89, and his eGFR was 27.57 ml/min. (R. 488, 490.) Dr. Guelich noted that his creatinine was "fairly stable," and that she would consider starting him on losartan for his blood pressure at his next visit. (R. 490.)

When Dr. Guelich saw Cody again that August, she noted weight gain in excess of 20 pounds since his last visit, which Cody attributed to "feeling better" and an increased appetite.

---

[5] Angiotensin-converting enzyme ("ACE") inhibitors "are used to treat high blood pressure by slowing the body's production of a hormone that constricts blood vessels." 2 Lawyers Desk Reference § 12:40 (10th ed. 2021).

He reported that he had been on ACE-1 before but that it had "bad side effects . . . (altered mental status)." (R. 485.) His BP was 160/96 (standing), his eGFR was 27.21 ml/min, his creatinine was "fairly stable," and Dr. Guelich prescribed losartan to manage his BP. (R. 485–87.)

Cody remained stable with no new complaints at follow-ups with Dr. Guelich in November 2014 and February 2015. (R. 479–484.) At the February appointment, however, Cody reported that he had not been taking his medications at home "because he says he didn't know he was supposed to be taking anything." (R. 479.)

When Cody returned to Dr. Guelich in April of 2015, he had no new complaints, reported that he was tired because "[h]e was up late last night with friends," but otherwise felt fine. (R. 476.) He again reported that he had not taken any medications since his last visit because "he has an aversion to medicine and doesn't want to take anything." (*Id.*) His BP was 155/104 (sitting) and, since he was not compliant with his medication regime, Dr. Guelich asked him to do a low-sodium diet, which Cody reportedly did not want to do. (R. 476–78.) Cody and Dr. Guelich also "talked about possibly going to see a mental health counselor but [Cody] had a bad experience after his dad died when he was 10 years old and he refuses to go to anyone now." (R. 478.)

At an appointment with Dr. Daugherty in May 2015 as a follow up for his Klonopin prescription, Cody reported that he was on lisinopril for his BP but stopped it because it made him feel "disconnected." His anxiety appeared well-managed and he generally was in good spirits. (R. 441.) He reported that he was looking to get his license and a job. (*Id.*) He also

reported that the Klonopin "helps but he tends to overthink things" and he was working "on keeping himself calm." (*Id.*) His BP was recorded as 142/94.

At his next several follow-ups with Dr. Guelich, Cody reported no new complaints. (R. 473 (June 29, 2015), 470 (August 31, 2015), 467 (December 10, 2015).) At his December appointment, though, Cody reported feeling tired and noted that he felt "shitty" and was "overwhelmed and anxious about life in general." (R. 467.) Cody was also "very angry . . . that his Klonopin dose [had] never been increased." (R. 469.) Dr. Guelich advised that she would not increase his dose of this controlled substance until he established care with a counselor or psychiatrist. His medical notes from these visits indicate an unwillingness to comply with a referral to a counselor or comply with Dr. Guelich's recommendations. (*See, e.g.*, R. 470 (self-reporting that he continues a "fairly high salt diet" and noting that he was prescribed a medication at his last visit "but he never filled it").)

At an ED visit for chest pains in December 2015, Cody reported that he stopped taking the Amlodipine prescribed for the blood pressure because he "disliked the side effects." (R. 384.) The ED provider cited Cody's medication non-compliance as a secondary impression. The provider also noted that Cody had elevated creatinine and "GFR low." (R. 383.) Cody was discharged with instructions to restart his Amlodipine "and continue use for more than one-day to determine if side-effects persist." (*Id.*)

In February 2016, Cody told Dr. Guelich he was "frustrated . . . with his kidney disease" and anxious, but he still refused to see a psychiatrist or therapist. (R. 464.) At that appointment, his BP was 147/91 (sitting) and his eGFR was 24.47 ml/min. (R. 464–65.) Though he had

previously balked at medication or a low-sodium diet, he "seemed amenable" to "daily exercise to help with overall health.'" (R. 466.)

On April 26, 2016, Cody returned to the LewisGale ED again, complaining of bilateral flank pain" that was radiating up his back. (R. 348.) Cody relayed to the ED physicians that he had "been experiencing constant and progressively worsening bilateral flank pain for the past year that became worse within the past 2 months. He point[ed] to his low back to describe the location of the pain and state[d], 'It feels like my kidneys are being squeezed to death, torn apart and stabbed to death.'" (*Id.*) On exam, Cody was "without acute abnormality" and his pain "was non-reproducible." (R. 354.) His hematology was "unremarkable," his BP was 173/96, and his eGFR was 23.0 ml/min. (R. 352–55.) Cody was hydrated, given morphine, and discharged with a prescription for Percocet and instructions to follow up with his nephrologist. (R. 354.)

At his follow-up with Dr. Guelich the next day, Cody described his pain as "going on for 3 months or so getting worse as time goes on." (R. 462.) His BP was 150/110 (161/97 while sitting), and although "[h]e has refused all blood pressure medications in the past because they make him feel 'out of his mind' . . . [h]e is willing to try something now as long as it doesn't affect his mental status." (*Id.*) She prescribed hydrochlorothiazide ("HCTZ") for his hypertension and ordered renal imaging to determine the cause of his flank pain. (462–63.)

The renal ultrasound was performed the next day and showed "[i]ncreased echogenicity of both kidneys, right more prominent than left. This likely reflects medical renal disease." (R. 417.)

On June 1, 2016, Cody met with Dr. Guelich and reported that he never filled his prescription for HCTZ. (R. 459.) Even without any medication, Cody reported that he was "doing well with no concerns." (*Id.*) He reported that his back pain had lessened and he conceded that his BP was "a problem." (*Id.*) His BP was 150/99 and his eGFR was 22.5 ml/min. (R. 459–60.) He was again directed to start the HCTZ and return in two months. (R. 461.)

At a follow-up appointment in August 2016 with Dr. Daugherty, Cody reported that his panic attacks had "settled down" from having as many as five per week in the past.[6] (R. 440.) Cody also reported, apparently for the first time, that he was suffering from "chronic fatigue." He said that his sleep is "messed up," its "[h]ard to fall asleep until late," he is usually up from 12–1 every night, and that he was "exhausted." (*Id.*) Cody also said that he was unable to stand up for more than an hour. Dr. Daugherty noted that Cody had "thus far refused counseling or psychiatric intervention." (*Id.*) He refilled Cody's Klonopin, added Celexa (citalopram hydrobromide), and instructed Cody to return in four months. (R. 443.)

At follow-ups with Dr. Guelich in October 2016 and July 2017, Cody reported no complaints. (R. 454, 729.) At his July appointment, he asked Dr. Guelich "about how to help his kidney function." (R. 731.) She suggested increased fluid intake and regular exercise, as well as Vitamins D and B complex. (*Id.*)

---

[6] In his brief, Cody repeatedly misrepresents this evidence (and his testimony before the ALJ). (*Compare* R. 440 ("He used to have 5 panic attacks a week. They have settled down.), *with* Pl.'s Br. Supp. Mot. Summ. J. at 26 [ECF No. 16] ("Dr. Daugherty noted that plaintiff continued to have as many as five panic attacks per week . . . ."), *and* R. 60 (Cody testifying that his panic attacks have "lowered from maybe five or six a week to about one."), *with* Pl.'s Br. Supp. Mot. Summ. J. at 2 ("Plaintiff testified that . . . despite the medication . . . he continues to . . . have approximately five or six panic attacks . . . a week . . . .").)

In October 2017, Cody told Dr. Daugherty that the Klonopin "seems to add to his fatigue and lack of energy" and that it seemed to "hurt more than it helps." (R. 975.) Cody reiterated his sleep problems and indicated that he wanted to "work on exercising." (*Id.*) Dr. Daugherty stopped Cody's Klonopin prescription and started him on Xanax (Alprazolam). (R. 977.) He also started Cody on Lopressor (metoprolol tartrate) for his hypertension. At his appointment, Cody's BP was 160/100. (R. 976.)

At a follow-up appointment the next month, Cody's BP was 138/90 (R. 973). He also said he was "doing better" on the Xanax "with improved mood and generally feeling better." (R. 972.) Cody also reported that he was "[w]orking with his brother and a friend." (*Id.*)

Later that month, Cody saw Dr. Guelich complaining of "extreme back pain, head pain, and throwing up." (R. 725.) Dr. Guelich reported that Cody said he could "deal" with the back pain, which felt like he was having "broken glass being ground into his spine," but the head pain was so severe it was causing him to vomit. (*Id.*) He was "tearful and frustrated." (*Id.*) His BP was 159/110 and his eGFR was 21.02 ml/min. (R. 726–27.) Dr. Guelich noted that his BP was "unacceptable" and that he had been counseled about it "at length at all prior visits" but refuses BP medication. She further noted that Cody has a history "of pain med seeking behavior" and that she would not refill his narcotic pain medications. (R. 728.) She ordered a head CT and lumbar spine MRI and referred him to Dr. Reibel for review of those results. She also noted that Cody has a "[s]ignificant mental health disorder" but has "refused referral to counselor or psychiatry and refuses antidepressant medication." (*Id.*)

When Cody returned to Dr. Guelich in May 2018, he was still complaining of neck and back pain. They also discussed exercise, and Cody seemed interested in the YMCA "because

they do have a sliding scale for membership" and he cited lack of resources (car and money) as a barrier. (R. 721.) His BP was 156/99 and his eGFR was 20.56 ml/min at this appointment. Dr. Guelich noted—again—that Cody refuses to take BP medicine "because he feels that [it] adversely affect[s] his body." (R. 721–23.) She prescribed Gabapentin and recommended exercise "to help with chronic pain." (R. 724.)

In September 2018, Cody reported no complaints. Dr. Guelich noted that his GFR "has been essentially stable—decline from 25 to 20 over last three years." (R. 716.) Cody did report that, when he tried metoprolol for his BP, the side effects were disabling, but when he stopped the medication, the side effects went away. His mother also asked for a referral back to the transplant team "to get things over with." (*Id.*) But his BP was 142/88 ("better . . . than it has been at past visits"), his eGFR was 21.95 ml/min, and his other lab work was "stable." (R. 716–19.) Dr. Guelich again "strongly recommended counseling/cognitive behavior therapy," and they spoke at length about dialysis and how receiving a kidney transplant would not be "getting it over with" because a transplant means a "lifelong process." (R. 720.) Cody agreed, and indicated he did not wish to "rush into transplant at this time." (*Id.*) Dr. Guelich also noted a high level of anxiety, irritability, and "labile affect," and that he got "very upset" discussing his symptoms. (R. 717.)

On January 16, 2019, Cody saw Ruth Peevey, FNP, complaining of fatigue that had lasted two days. He had also been experiencing "a generalized headache" and lower back pain, although the back pain had "resolved." (R. 969.) She noted his BP was 130/90 and that he was alert and oriented with a steady gait and 5/5 strength in his lower extremities. (R. 970.) She "[e]ncouraged adequate hydration, Tylenol PRN, and rest." (*Id.*)

Cody saw Dr. Guelich the next day. He reported that he did not feel well, and Dr. Guelich noted that he "struggles with anxiety and chronic pain issues." (R. 711.) She further noted that he "develops unique reactions to medications, especially blood pressure medications." (*Id.*) They spoke again about seeking psychiatric help, and Cody indicated that he wanted to apply for disability. His BP was 157/95 ("elevated but improved") and his eGFR was 19.83 ml/min. (R. 712–14.) Dr. Guelich noted her belief that Cody will need "counseling in regards to his medication aversion and other things," and hoped that "the transplant team will reinforce that." (R. 714.) She recommended "PD rather than transplant," and Cody agreed "that he does not want to rush into transplant at this time." (*Id.*) She also started him on minoxidil for his BP.

Cody went to the LewisGale ED again on March 20, complaining of chest pains that were exacerbated by deep breaths, movement, and his anxiety. (R. 619.) Cody noted that the pain had been ongoing for approximately a week without relief. Cody was noted to be alert and oriented and in no acute distress. (R. 621.) His physical exam was normal, a chest x-ray did not indicate any abnormalities or acute processes, and it was noted that his marijuana use could be the cause of his symptoms. (R. 633, 624–25.) He was instructed to stop using marijuana to see if his symptoms subsided and to return to the ED if his symptoms worsened.

On Dr. Guelich's referral, Cody met with Dr. Kenneth Brayman for a consultation regarding his candidacy for a kidney transplant on March 27, 2019. Dr. Brayman noted that Cody was not on dialysis, was not taking medication for his anxiety, and was not under the care of a psychiatrist. (R. 674.) He also noted that Cody was "[a]nxious over disease and need for a transplant. Smokes marijuana to control anxiety symptoms." (*Id.*) A review of Cody's

systems were normal across the board, and Dr. Brayman noted that Cody "has a normal mood and affect," "[h]is behavior is normal," and his "[j]udgment and thought content [are] normal." (R. 676.) Dr. Brayman concluded that Cody was "a high[-]risk candidate for transplantation due to anxiety and incompletely treated psychiatric issues," and he recommended that Cody enter into "consistent therapy with a psychiatrist" before work up began on him for a transplant. (R. 677.)

At his follow-up appointment with Dr. Guelich the same day, Cody did not refuse the referral to a psychiatrist, so Dr. Guelich stated she would "place the referral ASAP." (R. 707.) She also started him on Clonidine for his BP, which measured 168/96 at his office; his eGFR was 19.83 ml/min. (R. 708–10.)

On August 12, 2019, Cody returned to Dr. Guelich and reported "no complaints." Dr. Guelich noted that Cody's BP was "much better controlled" on the Clonidine and that Cody "seems to be feeling better." She also noted that Cody's "[m]ental status [is] better today – calm. So far has refused to see counselor," but "[h]e does seem eager for transplant so I think he would go if directed by transplant team." (R. 880.)

At his next appointment in December, Cody's BP was down even more—122/87— and Dr. Guelich noted that Cody was "quite happy" with the Clonidine, given his past experiences with BP medications. (R. 875.) She also noted that Cody's "[m]ental status [is] much better today – not reporting anxiety, panic or pain. Engaging in more activities at home now like cooking." (R. 877.)

In July 2020, although he indicated he had no complaints, Cody expressed to Dr. Guelich that he was "frustrated" that he could not get disability benefits. (R. 917.) His BP was

"up" (164/94), and his eGFR was 20.96 ml/min. (R. 917–18.) Dr. Guelich did not make any

changes to his treatment plan, but she *again* recommended that Cody make an appointment

with a psychiatrist. (R. 918.) In a follow-up letter to Cody, Dr. Guelich indicated that his "labs

look stable." (R. 919.)

The next month, Cody had x-rays done of his spine and lower back. (R. 901–02.) The

imaging indicated that there was "[m]ild endplate changes [that] could be associated with early

degenerative change," and "[t]he L4-5 disc space appears mildly narrowed." (R. 903.) There

was "[n]o acute lumbar spine osseous abnormality." (*Id.*)

When Cody returned to Dr. Guelich on December 7, 2020, he reported "no changes,

no complaints." (R. 915.)

In April 2021, Cody was "anxious and tearful" at his appointment with to Dr. Guelich.

(R. 941.) She noted that "[h]is anxiety seems to be getting worse," and that he "self medicates

with" marijuana. (*Id.*) She also noted:

> For his mood disorder I've suggested seeing a psychiatrist. He
> gets very upset when this is mentioned. He had a bad experience
> when he was a kid. I've explained that having one bad experience
> 15 years ago doesn't mean that he should never seek help for
> mental health. I think he should be evaluated for his psychiatric
> condition and treated appropriately with something other than
> benzodiazepine and marijuana.

(R. 942.) She also noted that he was "only willing to take clonidine" for his BP, which was

157/102. (*Id.*)

Later that month, Cody went to the ED with complaints of nausea and vomiting that

had persisted over the past four days. His lab work showed worsening renal function and Cody

was offered rehydration, but he declined. (R. 1025.) He reported that he felt better with the nausea medication and "will continue to hydrate at home." (*Id.*)

Five days later, on April 23, Cody saw Ruth Peevey, FNP, regarding the "nausea, vomiting, and generalized abdominal pain" that had not subsided since his trip to the ED. (R. 967.) He was given Zofran and Phenergan for the nausea, but those proved ineffective. Because it was 4:00 p.m. on a Friday and therefore too late to get lab results, FNP Peevey suggested he return to the ED for evaluation. (*Id.*)

At the ED, Cody's physical examination was unremarkable, but he was admitted for an acute kidney infection/renal failure, hypokalemia, and COVID-19. (R. 1011–17.) His care plan included hydration for the renal failure, potassium for the hypokalemia, and steroids for the COVID-19. (R. 1018–19.) He was discharged on April 26 with a notation that his acute kidney infection had resolved. (R. 1014.)

On July 13, Cody saw Dr. Pauley at Valley View Family Practice to establish care. Medical records indicate that Cody was assessed as suffering from: chronic kidney disease; glomerulonephritis; hyperparathyroidism due to renal insufficiency; generalized anxiety disorder; and panic disorder. (R. 963.) His examination was normal, they spoke about his diet, and he was advised to return in one year. (R. 964.)

Cody's August 5 appointment with Dr. Guelich was uneventful. He had no complaints, he reported that he had "recovered completely" from his hospitalization, and his BP was "much better . . . than usual." (R. 946.)

When Cody returned in December 2021, his lab work was "stable" but his BP was high. Cody told Dr. Guelich that he had not taken his Clonidine that morning because it makes

him sleepy. (R. 953.) His eGFR was reported at 19.56 ml/min. (R. 955.) Dr. Guelich also noted that Cody had been referred for a transplant, "but they required psychiatric eval, and so far [Cody] has refused. GFR stable at 19." (R. 954.)

Three months later, Cody returned to Dr. Guelich and the story was very similar. Cody's BP was high because he had not taken his Clonidine. He relayed that it makes him sleepy, "so he doesn't like to take it before office visits." (R. 991.) He did indicate a willingness to try a Clonidine patch, however.

## C.    Opinion Evidence

As part of Cody's application for disability benefits, Cody saw Dr. Wilson for a Disability Determination Services evaluation on September 12, 2020. (*See* R. 906–11.) After a review of Cody's medical history, Dr. Wilson examined Cody. He noted that Cody "was alert and had good eye contact and fluid speech. [His m]ood was appropriate and [he] had clear thought processes. [Cody]'s memory was normal and [his] concentration was good." (R. 908.) His muscle strength was universally noted to be 5/5, and his reflexes were normal. (R. 909.) He noted that Cody was "able to button, and unbutton a shirt, pick up a coin from a table, grasp a pen, and write a sentence, lift and carry, and handle light objects." (*Id.*) He noted that he had no problems ambulating or rising from a seated position. Cody's range of motion was perfect across the board. (R. 910.) Overall, Dr. Wilson concluded that Cody

> can be expected to sit, stand and walk normally in an 8-hour workday with normal breaks. [He] does not need an assistive device with regards to short and long distances and uneven terrain. [He] can be expected to carry 15 pounds frequently and 25 pounds occasionally. There are no limitations on bending, stooping, crouching, squatting, and so on and [Cody] will be able to perform those frequently. There are no manipulative limitations on reaching, handling, feeling, grasping, fingering,

- 19 -

pushing, pulling, and [Cody] will be able to perform these frequently. There are no relevant visual, communicative, or work place environmental limitations.

(R. 911.)

On April 28, 2021, Cody met with Dr. Marvin Gardner, who performed a psychological examination in connection with Cody's application for disability benefits. Dr. Gardner reviewed Cody's medical history and subjective complaints and performed a mental status exam. (R. 932–36.) He also tested Cody's cognitive functioning, noting that his "ability to think abstractly was mildly impaired," and that his "overall judgment is good to fair." (R. 935.) Ultimately, Dr. Gardner opined that Cody "is able to perform simple and repetitive work tasks and to maintain regular attendance in the workplace," he is "able to perform work activities on a consistent basis," and he "is able to complete a normal workday or work week without interruptions resulting from his psychiatric condition." (R. 936.) He also stated his opinion that Cody "would likely have a difficult time emotionally if he were to attempt dealing with the usual stresses encountered in competitive work. He would likely become increasingly anxious and depressed in the workplace." (*Id.*)

Dr. Guelich submitted a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" in February 2022. (R. 980–84.) In it, Dr. Guelich opined that Cody can only "[o]ccasionally" lift or carry less than 10 pounds. Although she checked "yes" to indicate that Cody's impairments affect his ability to stand and/or walk, she did not indicate the extent of those limitations. The same applies to her response for sitting. And although Dr. Guelich indicated that resting in a supine position or easy chair was not medically indicated, she noted that he *would* need to do so to relieve pain and fatigue arising from "chest pain, scalp pain, pain

in back & limbs, numbness, tingling." (R. 981.) She believed Cody could "frequently" perform all listed postural activities, and noted that Cody

> experiences severe pain in his scalp, that radiates down his back and to his limbs. He has severe, uncontrolled hypertension. He has severe kidney disease, near dialysis. He has not tolerated pain medications, nor BP medications. He has severe anxiety as a result and rarely leaves his home. He is not able to drive and has limited transportation.

(R. 982.) She believed Cody is "constantly" "limited" with *all* manipulative functions (reaching, handling, fingering, and feeling), and that he was "limited" in *all* visual/communications functions (seeing, hearing, and speaking)—though she declines to describe how Cody was limited in those areas—and that *all* environmental limitations (temperature extremes, noise, dust, vibration, humidity/wetness, hazards, and fumes/odors/chemicals) were caused by Cody's impairments. (R. 982–83.) She also estimated that Cody would be absent from work more than three times per month. (R. 983.)

As part of the initial review of Cody's disability application, Disability Determination Services (and two of their physicians) reviewed his medical records and prepared a written determination of Cody's "medically determinable impairments and severity." (*See* R. 86–91.) Dr. Michael Koch, who reviewed Cody's medical records to opine on his RFC,[7] found that Cody's chronic kidney disease was a severe impairment, but that his spine disorder was not. As a result of Cody's impairments, Dr. Koch believes that Cody will suffer from "pain, fatigue, sustained concentration and persistence limitations," and "social interaction limitations," but

---

[7] As noted above, a claimant's RFC is "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).

that Cody's "statements about the intensity, persistence, and functionally limiting effects of the symptoms" were not substantiated by the "objective medical evidence alone." (R. 88.) Dr. Koch was of the opinion that Cody can occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. (R. 89.) Overall, Dr. Koch believed that Cody would be able to perform work at the medium exertional level.[8]

Dr. Richard Lauck, a psychological consultant with Disability Determination Services, also reviewed Cody's medical records. Dr. Koch opined that Cody's anxiety and obsessive-compulsive disorders were not severe impairments and that Cody had only "mild" limitations in understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. (R. 87.) Dr. Lauck ultimately concluded that Cody's anxiety was "nonsevere." (*Id.*)

## D.    Relevant Testimony

At the hearing before the ALJ, Cody testified regarding his medical history, his symptoms, and his limitations. Cody testified that, in August 2013, he experienced heart palpitations so he went to the ED where he first received his chronic kidney disease and glomerulonephritis diagnoses. (R. 58–59.) He also stated that he experiences chronic fatigue "daily" that "will be and has been compounded by [his] medication side effects." (R. 59.) He says that he experiences fatigue and anxiety "daily." He noted that he takes "three main

---

[8] "To determine the physical exertion requirements of work in the national economy, [the Social Security Administration] classif[ies] jobs as sedentary, light, medium, heavy, and very heavy. . . . Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

medications," all of which cause "drowsiness or fatigue." (*Id.*) He further stated that both his Alprazolam (for panic attacks) and Clonidine (for his BP) cause immediate drowsiness once taken. (R. 59–60.) As a result, he testified that he takes at least one two-hour nap per day and is "pretty much tired all day." (R. 60, 62.) On some days, his nap can be as long as three hours, and occasionally he needs to nap several times a day. (R. 62–63.) He says that he rarely sleeps continuously through the night because he has to use the restroom frequently—every 90 to 120 minutes, and at least 4–6 times per night. (R. 66.)

Before Cody began taking medication for his anxiety, he reported that he suffered 5–6 panic attacks per week, but with the medication, his attacks have "lowered . . . to about one" per week. (*Id.*) When one does come on, it lasts "anywhere from 30 minutes to an hour." (*Id.*)

Cody also noted that his weight causes pain in his back and neck, although he has experienced such pain his "whole life." (R. 59.) He reported that he experiences lower back pain "because [he] cannot afford a chiropractor." (R. 59.) He also testified that he experiences headaches "at least twice a week stemming from the neck" that can last as long as six hours. (R. 62.)

Between 2013 and 2022, Cody reported approximately 60–80 pounds of weight gain, mostly attributable to "sugary drinks and poor diet." (R. 61.) According to Cody, his kidney disease makes it hard to regulate his appetite. (R. 61–62.)

Cody's attorney also questioned him about his aversion to medication. She noted that there "was some resistance on [his] part as far as what [he] needed to do . . . consistently taking [his] medications and following doctor's orders." (R. 63.) Cody explained:

> I tried everything, probably about ten different kinds of high
> blood pressure medications from her advice and I did everything

> that I could that she told me to do, but there were times where I
> would report the negative side effects of the drug and my doctor
> didn't appreciate that to some extent, like I was just reporting
> how I felt on the medicines at the time. . . . If there was ever a
> time where I did not take the medication it was because I had
> been taking it and experiencing worse adverse reactions than I
> was used to or comfortable with.

(R. 63–64.)

With regards to his limitations, Cody testified that he could sit "[m]aybe 20 minutes" before he needs to change positions. (R. 67.) Failure to do so results in a "strained" feeling where he had a kidney biopsy and his back and shoulders feeling "out of place." (*Id.*) He says he can stand in one place for 45 minutes to an hour "before [h]is legs and hip start feeling inflammation." (*Id.*)

Cody also testified that his anxiety caused "problems interacting with other people or being around other people" and caused him to "overthink[], just negative recurring thoughts, not knowing what to say." (R. 69.) He testified that his friendships are mostly based online because "[t]he medication side effects make [him] . . . angry and agitated and [he] pushed a few people away." (*Id.*) He is relegated primarily to "social media or chatting online." (*Id.*) He also has difficulty "concentrating and focusing" "all the time." (R. 70.)

Around the house, Cody reported that he "tr[ies] to do his own laundry and cook [his] own meals," but noted that "[a]ny kind of physical activity, strenuous activity, even as little as doing the laundry and going up and down stairs, causes strain on [his] heart." (R. 68.) He can perform those activities for "[m]aybe 10 minutes" before needing to rest for 30 minutes to an hour. (R. 68–69.) Given his already high BP, he says his doctors have told him he is "close to stroke or heart attack range." (R. 68.) He doesn't "necessarily" have trouble walking, but he

- 24 -

cannot "walk very far without [his] hips kind of feeling inflamed." (R. 71.) After walking 20-30 minutes, he needs to rest for 5-10 minutes. (*Id.*)

As it relates to his need for a kidney transplant, Cody testified that his GFR "has dropped below 20 and its currently sitting at 19," meaning he "might need dialysis sooner than [they] thought in the coming months." (R. 71–72.) Cody also recognized that the transplant team wants him to go to therapy prior to a transplant, which he testified he was willing to do. (R. 73.) The ALJ questioned Cody's prior refusal to seek a therapist, and Cody explained that it was because doing so would require frequent road trips—around eight hours roundtrip—and he did not have a means to travel. (R. 75.) He further explained:

> [I]t wasn't a refusal as much as that was the last time I was made aware of that situation. I know they wanted me to, they wanted me to meet my surgeon and they wanted him also to address that about having a psych evaluation because there are kids who get the transplant and don't take the medication. . . .
> I made it very clear to them that I wasn't fully understanding why there was a barrier to entry. That's because I don't think everybody that walks in there has to have a psychiatrist evaluation to receive transplant. They're making a very specific case of me because of my anxiety, so they wanted me to get psych evaluated.
> And, like I said, I — at the time I couldn't because I don't have insurance and I don't have a way of getting there myself personally just me. My mother was . . . working at the time and they wanted us to — I'm not even sure where they wanted us to go but it was, like I said, eight-hour roundtrip multiple times a week and it just wasn't possible.
> And it's the last time — whenever it was brought up that was the last time I was made aware of it because it had not been mentioned or talked about since that time, not to me personally.

(R. 75–76.)

In addition to Cody, Vocational Expert Samuel Edelmann testified. Edelmann testified that a hypothetical claimant "of [Cody's] age, education, and work experience who is capable

of performing light exertional work with frequent postural activities but no ladder, rope, or scaffold climbing" and who is required to "avoid concentrated exposure to industrial hazards and to loud noise such as heavy traffic" could perform jobs in the national economy, specifically retail marker, photocopy machine operator, or electrical accessories assembler. (R. 77.) When the hypothetical claimant was limited to sedentary work with occasional postural activities (but still no ladder, rope, or scaffold climbing), a sit/stand option for five minutes every hour while remaining on task, normal breaks every two hours for 10-15 minutes, and who is required to avoid "concentrated exposure to temperature extremes, vibrations, hazards, and loud noise such as heavy traffic," Edelmann opined that the jobs of document preparer, addresser, and assembly work that is not limited to table work—all of which exist in significant numbers in the national economy—could be performed. Those jobs could still be performed if the hypothetical "individual was able to perform simple unskilled tasks, [is] able to maintain attention and concentration for two-hour periods with normal breaks, [and] can occasionally make independent decisions, and can occasionally interact with others." (R. 78.) Edelmann also testified that, for the jobs he identified, employers would "typically" tolerate an employee being off task 10% of the time and would tolerate "[o]ne absence per month." (R. 79.)

Cody's attorney asked Edelmann how is opinion would be impacted by "a hypothetical individual who would have a difficult time dealing with the normal stressors that are encountered in competitive work." (R. 79.) Edelmann was unable to answer because he did not "know what a difficult time is." (*Id.*)

Although she did not testify at the hearing, Cody's mother submitted a Function Report outlining her opinion of Cody's abilities and limitations. (*See* R. 294–301.) In her statement,

she noted that Cody "can't lift[,] has neck and back pain, does not have [a] car, can't walk for a long period of time, gets tired easily, [and] gets sick on stomach often." (R. 294.) She reported that Cody helps her fold towels every other day and feeds the cat daily. (R. 295–96.) She also said that Cody does not sleep well because of back pain and anxiety but that he has no problem with personal care and does not need reminders to attend to his personal grooming or take his medications. (R. 295.)

She also reported that Cody prepares simple meals—sandwiches or microwavable meals—although she prepares most dinners. (R. 296.) Prior to the onset of his symptoms, "[h]e would cook a little more." (*Id.*) She also noted that many of Cody's limitations are because he lacks the necessary funds to complete them, i.e., he isn't able to "[p]ay bills" because he "does not have any money," he does not go out alone because he "can't drive," and he "does not get out much" because he "doesn't feel good" and "has not [*sic*] car or money." (R. 297–99.)

Cody's mother also stated that his illness, injuries, or conditions affect his: lifting; squatting; bending; standing; reaching; walking; sitting; and kneeling, and that he can walk 1/4 mile before needing to rest for 15 minutes. (R. 299.) When asked how Cody handles stress, she reported that he "has anxiety." (R. 300.)

## E.      The ALJ's Opinion

In his written decision, the ALJ concluded that Cody suffered from the following severe impairments: glomerulonephritis; chronic kidney disease; hypertension; hyperparathyroidism; lumbar spine degenerative changes; anxiety disorder; and depressive disorder. (R. 23.) He found that Cody did not suffer from "an impairment or combination of

- 27 -

impairments" that met or medically equaled one of the listed impairments in the applicable regulations. (R. 24–28.) And after "careful consideration of the entire record," the ALJ found that Cody has the RFC to perform sedentary work as defined in the regulations, *see* 20 C.F.R §§ 404.1567(a), 416.967(a),

> except he can occasionally perform postural activities but cannot climb ladders, ropes or scaffolds; requires the option to sit or stand for five minutes every hour, but would remain on task during those periods; requires normal breaks every two hours for 10-15 minutes; should avoid concentrated exposure to temperature extremes, vibrations, industrial hazards, and loud noise such as heavy traffic; can perform simple unskilled tasks and maintain attention and concentration for two-hour periods with normal breaks, can occasionally make independent decisions; can occasionally interact with others; and would be off-task 10% of the workday.

(R. 28.) As a result, the ALJ found that a significant number of jobs exist in the national economy that Cody can perform—such as document preparer, addresser, or table worker—and that Cody therefore was not under a disability from August 20, 2013, though April 13, 2022. (R. 41–42.)

### III. ANALYSIS

Cody lodges three overarching arguments: (1) that the ALJ's assessment of Cody's mental impairments is not supported by substantial evidence (Pl.'s Br. Supp. Mot. Summ. J. at 26–34); (2) that the ALJ's assessment of Cody's physical impairments and the ALJ's RFC findings are not supported by substantial evidence (*id.* at 34–38); and (3) that the ALJ's assessment of Cody's allegations is not supported by substantial evidence (*id.* at 38–45).

A.    **Mental Impairments**

Cody argues that the ALJ's analysis of his mental impairments did not satisfy the requirements of Social Security Ruling 96-8p, and that the ALJ's RFC finding failed to adequately account for Cody's limitations in concentration, persistence, and pace.

"RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2. "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." *Id.* (emphasis in original).

"In the RFC assessment, the ALJ uses all relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'" *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945). "SSA guidance directs the ALJ to first consider a claimant's abilities on a 'function-by-function basis' before expressing a claimant's RFC in terms of exertional levels . . . ." *Id.* (citing *Mascio v. Colvin*, 780 F.3d 632, 636–37 (4th Cir. 2015)). The RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. An ALJ's RFC assessment is

satisfactory so long as the ALJ "sufficiently explain[s] his conclusions" and "use[s] evidence from the record to explain his finding[s]." *Ladda*, 749 F. App'x at 172.

Here, the ALJ's discussion of Cody's mental limitations satisfies this standard. In determining that Cody had a "moderate" limitation in interacting with others, the ALJ pointed to numerous medical records that consistently described Cody as having a normal mood and affect. (*See* R. 463, 471, 480, 962, 964, 967, 1018.) He also cited his activities of daily living, which included spending time with friends and family, which necessarily required interacting with other people. Accordingly, the ALJ gave valid reasons for concluding that Cody's moderate limitations in this area were addressed by the limitation in his RFC that he only can occasionally interact with others. (R. 26.)

Elsewhere in his written decision, the ALJ also discussed why he concluded that Cody's mental health impairments are not as severe as he claims and explained why he imposed the mental limitations he did in Cody's RFC. First, the ALJ found that Cody's mental limitations were in fact severe, noting his years-long prescription for anti-anxiety medication. (R. 34–35.) He further concluded that, "[c]onsidering the documented persistence of the claimant's psychiatrically-based [*sic*] signs and symptoms over time, the undersigned finds that the claimant has 'severe' medically determinable mental impairments, which contribute to mental work-related limitations as stated in the . . . residual functional capacity finding." (R. 35.)

Despite those limitations, the ALJ determined that Cody's mental health complaints were only partially consistent with "other evidence" in the record. The ALJ explained his determination that "the totality of the evidence shows that the above limitations [included in the RFC] adequately accommodate the claimant's mental health problems. Though the

claimant's observed mental status has been somewhat abnormal at times, findings have been normal or unremarkable in other areas related to the ability to do basic mental work activities." (*Id.*) As support for this statement, the ALJ cited to various medical records where Cody was alert and oriented and his mood and/or affect were documented as "normal." (*See* R. 351, 380, 396, 409, 460, 465, 961, 967, 1007–08, 1018, 1023.) He also noted several primary care visits where Cody had a normal and/or appropriate mood and affect. (*See* R. 962 ("appropriate mood and affect, no thought disorder, good eye contact"); 964 (same); 967 ("mood and affect appropriate"); 1008 ("Affect NL, Mood NL"); 1018 ("[h]is mood and his affect looks appropriate"); 1023 ("Affect NL, Mood NL").) The ALJ further noted that, during Cody's psychological consultative exam, "a mental status examination showed normal findings in terms of the claimant's memory, computation skills, and concentration," and Cody's "overall insight and judgment were good to fair." (R. 35 (citing R. 935).)

Additionally, the ALJ noted that Cody's "treatment records document meaningful relief of his mental health symptoms with routine medication management, even though the claimant has not pursued specialist treatment as recommended by medical providers up to this point." (R. 35.) *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). The ALJ also cited and discussed several medical appointments where Cody described his mental health symptoms had improved, were under control, or had settled down. (*See* R. 440–41, 498, 871–73.)

In sum, the ALJ explained—in detail throughout his written decision—why he concluded that Cody's mental health limitations were in-line with the limitations stated in the RFC, and the court cannot agree that the ALJ failed to explain how he arrived at his

conclusions or that he failed to "provide a sufficient explanation in the decision to allow the Court to conduct meaningful review of the RFC determination." (Pl.'s Br. Supp. Mot. Summ. J. at 29.)

Cody also asserts that the ALJ improperly considered Cody's activities of daily living by failing to acknowledge the extent to which he engages in them. *See, e.g.*, *Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 263 (4th Cir. 2017); *Schandel v. Comm'r of Soc. Sec. Admin.*, No. 4:14-cv-00042, 2016 WL 3268758, at *3–4 (W.D. Va. June 7, 2016). But the ALJ did not contend that Cody's activities of daily living establish that he can interact with others for an entire workweek. Rather, he stated that "there is evidence that [Cody's] activities of daily living include spending time with friends and family, which would require some interaction with others." (R. 26.) He therefore limited Cody to "occasional[] interact[ion] with others," which is a logical extension of Cody's self-reported activities. (*See id.*) Accordingly, the court finds that the ALJ's reference to Cody's activities of daily living and attendant limitations drew an "accurate and logical bridge" from the evidence to his conclusion. *See Monroe*, 826 F.3d at 189 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

Finally, Cody's takes issue with the ALJ's partial acceptance of the opinion of Dr. Marvin Gardner, who opined that Cody "would likely have a difficult time emotionally if he were to attempt dealing with the usual stresses encountered in competitive work." (R. 936.) Although the ALJ found Dr. Gardner's opinion "partially persuasive," he found the cited opinion to be without support in the record. After citing numerous instances where Cody's healthcare providers failed to "note significant abnormalities in his observed mental status, apart from abnormal mood or affect at times" (*see* R. 351, 380, 396, 409, 460, 465, 961, 967,

1007–08, 1018, 1022–23), the ALJ concluded that Cody "did not have serious behavioral abnormalities as might suggest an inability to tolerate usual stresses in the workplace."

When determining the persuasiveness of medical opinions, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship the medical source has with the claimant, including the (i) length, (ii) frequency, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship; (4) specialization, and (5) other factors. 20 C.F.R. § 404.1520c. "The factors of supportability . . . and consistency . . . are the most important . . . ." *Id.* § 404.1520c(b)(2). Cody does not challenge that the ALJ failed to review Dr. Gardner's opinion under the appropriate framework, only that the ALJ's conclusion with respect to Dr. Gardner's opinion is "not supported by substantial evidence." For the reasons noted above, the court disagrees. The ALJ gave detailed, correct, and logical reasons to reject part of Dr. Gardner's opinion, and it is not this court's prerogative to opine on the correctness of that conclusion so long as it is supported by substantial evidence. *See Johnson*, 434 F.3d at 653.

In sum, the ALJ gave clear reasons for why he included in Cody's RFC the limitation that he only occasionally interact with others, and the Record amply supports this conclusion. The court finds no error in the ALJ's analysis of Cody's mental impairments.

## B.   Physical Impairments

Cody makes similar objections to the ALJ's discussion of the evidence related to his physical impairments. (*See* Pl.'s Br. Supp. Mot. Summ. J. at 34–38.) At bottom, Cody objects to the ALJ's evaluation of his "pain and its impact upon his ability to perform work[-]related activities." (*Id.* at 36.)

First, Cody argues that the ALJ failed to make specific findings "regarding whether [his] impairments would result in episodes of pain or fatigue that would necessitate [Cody] taking breaks and if so, how often those breaks would occur." (*Id.*) But the ALJ did make a finding regarding Cody's chronic pain. After discussing the medical evidence of Cody's chronic pain, he concluded that Cody "is restricted to a range of sedentary work with reduced postural limitations," but that "[n]o further limitations are warranted for the claimant's chronic pain issues, considering that the physical examinations showed otherwise normal skeletal findings, including consistently normal gait and posture." (R. 34.) He also noted that Cody's pain has been conservatively managed, which further indicates the inapplicability of additional limitations. *See, e.g.*, *Dunn v. Colvin*, 607 F. App'x 264, 274–75 (4th Cir. 2015) (considering the conservative nature of treatment as evidence that "the alleged disability is not as bad as the claimant says that it is"); *Gross*, 785 F.2d at 1165–66; *Debra S. v. O'Malley*, Case No. 7:23-cv-00161, 2024 WL 923008, at \*11 (W.D. Va. Mar. 4, 2024). While Cody may disagree with the ALJ's conclusion, it is simply incorrect to argue that he failed to make one.[9]

Next, Cody argues that the ALJ erred in finding Dr. Guelich's medical opinion unpersuasive. (*See* R. 38–39.) After a review of Dr. Guelich's opinion, the ALJ found that she failed to offer any support for her lifting restriction, noting that it was contradicted by her own records and Cody's 5/5 strength during the consultative exam. (*See* R. 909.) *See* 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive . . . [it] will

---

[9] The court notes that the ALJ *did* include 10-15 minutes breaks every two hours in Cody's RFC. (R. 28; *see also* R. 27 (explaining inclusion of "off-task" time in the RFC to account for exacerbations in Cody's symptoms).)

be."). She also opined that Cody would need to rest throughout the day for "chest pain, scalp pain, pain in back and limbs, numbness, tingling," even though her own records repeatedly noted that Cody had no complaints and that some of the listed pains she anticipated he would experience were "resolved" some time ago. (*See* R. 871 (listing "[h]istory of chronic pain," "[h]istory of flank pain," "[h]istory of headache," and "[p]ain of lumbar spine" all as "Resolved:06Dec2019"). Likewise, Dr. Guelich's opinion that Cody suffered from "severe, uncontrolled hypertension" is at odds with her own notes that report Cody's BP was "well controlled." (*See* R. 947.) Finally, despite 20/20 visual acuity and no reported vision or hearing problems in his medical records, Dr. Guelich indicated that Cody was "limited"—though she omitted any explanation of how or to what extent—in seeing, hearing, and speaking. (R. 983.)

When considering the medical records, the court has no trouble concluding that the ALJ's decision to give Dr. Guelich's opinion no weight is supported by substantial evidence. Cody's argument to the contrary is meritless.

Cody also argues that "[t]he ALJ . . . ignored evidence of complaints to Dr. Guelich and the emergency room by [Cody] of fatigue and lack of energy, severe flank pain, severe thoracic and back pain, chest pain and heart palpitations, nausea and vomiting, and blood pressure spikes." (Pl.'s Br. Supp. Mot. Summ. J. at 37.) Again, even a cursory review of the ALJ's decision will show that he did not ignore this evidence. (*See, e.g.,* R. 33 ("[T]here are scattered reports of back pain and neck pain throughout the medical evidence of record.").) Insofar as Cody argues that there is not substantial evidence to support the ALJ's conclusion regarding his pain and other symptoms, Cody ignores the fact that for every complaint of pain in the record, there are appointments where Cody reported no pain and no complaints. (*See,*

*e.g.*, R. 871, 878, 915, 917, 941, 946, 953, 991.) Cody does not appear to take issue with the accuracy of the ALJ's recitation of the medical evidence, so his argument boils down to asking this court to reweigh the evidence of his pain and find in his favor. Even if the court were inclined to disagree with the ALJ's conclusion, it is not this court's job to "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (cleaned up).

Cody contends that "[t]he ALJ's RFC assessment is very cursory and does not comply with SSR 96-8p, ignores significant and substantial evidence in the record contradictory to the ALJ's findings and fails to assess [Cody's] ability to sustain work activities over the court of an eight[-]hour workday." (Pl.'s Br. Supp. Mot. Summ. J. at 38.) For all the reasons discussed above, the court disagrees. The ALJ's discussion is in keeping with applicable regulations and relevant case law, *see* SSR 96-8p; *Monroe*, 826 F.3d at 189, and the court finds the ALJ's treatment of Cody's physical impairments is supported by substantial evidence.

## C.    Cody's Allegations

Cody's final argument relates to the ALJ's treatment of his subjective allegations. When considering a claimant's subjective allegations, "[t]he ALJ may choose to reject a claimant's testimony regarding his pain or physical condition, but he must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence." *Mabus v. Colvin*, No. 4:13-cv-3028, 2015 WL 1400053, at *15 (D.S.C. Mar. 26, 2015) (citing *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989)).

> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's

> symptoms are (or are not) supported or consistent." It is also not
> enough . . . simply to recite the factors described in the
> regulations for evaluating symptoms. The determination or
> decision must contain specific reasons for the weight given to the
> individual's symptoms, be consistent with and supported by the
> evidence, and be clearly articulated so the individual and any
> subsequent reviewer can assess how the adjudicator evaluated the
> individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *10 (Oct. 25, 2017).

Here, the ALJ found that Cody's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Cody's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 30.) As it relates to Cody's statements about his fatigue, the ALJ noted the "intermittent frequency of [Cody's] documented complaints, and his overall course of treatment" as bases to find that "the asserted degree of medical severity and functional loss is not entirely consistent with other evidence in the record." (R. 31.) As it relates to Cody's allegation of constant fatigue, the ALJ stated that "the longitudinal medical evidence shows considerable variability in the severity of the symptoms." (*Id.*) For example, prior to age 22, Cody "was typically noted to report 'no complaints' during nephrology visits." (R. 32; *see* R. 464, 467, 470, 473, 476, 479, 488, 491, 495.) The ALJ also noted that, even when Cody was not compliant with his medication, he reported no issues and that he was "doing well." (*See* R. 482.) And 3 months later, when he wasn't taking his medication because "he didn't know he was supposed to be taking anything," Dr. Guelich noted that he was "doing well" and "in good spirits" with "[n]o new concerns" and "no complaints." (R. 479.) In April 2015, Cody reported being tired after being up late with friends, and even though he had not taken "any med[ication]s since his last visit," he

reported "no complaints" and noted that he did not want to take any medications and did "not want to do a low[-]sodium diet." (R. 476.) *See* SSR 16-3p, 2017 WL 5180304, at *9 ("[I]f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."); *Ella H. v. Kijakazi*, No. 3:21-cv-00804, 2022 WL 18539718, at *13 (E.D. Va. Dec. 19, 2022),*R&R, adopted by* 2023 WL 1422365 (E.D. Va. Jan. 31, 2023).

And Cody's complaints of drowsiness or fatigue related to his medication appear to have ceased once Dr. Guelich started him on Clonidine. (*See* R. 874 ("He has tried many BP meds, and is quite happy with clonidine. BP much better. He is otherwise feeling well. No new concerns today.").) *See Stitely v. Colvin*, 621 F. App'x 148, 150–51 (4th. Cir. 2015) ("[T]he ALJ properly noted that Stitely's impairments were treated with limited, conservative treatment that improved some of Stitely's conditions."); *see also Smith v. Colvin*, 756 F.3d 621, 626 (8th Cir. 2014).

As it relates to Cody's anxiety, the record is replete (as the ALJ notes) with references to Cody's refusal to see a psychiatrist. (*See* R. 440, 462, 743, 880, 954, 972.) The ALJ appropriately credited Cody's explanation that cost and transportation were the hindrance, *see Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) ("A claimant may not be penalized for failing to seek treatment []he cannot afford . . . ."), but further noted that "treatment notes do not show any major changes in [Cody's] complaints or plan of treatment after he was determined to be a high[-] risk candidate for transplantation due to anxiety and incompletely treated psychiatric issues" (R. 32). The ALJ's summary of the medical evidence in support of this conclusion is accurate and thorough (*see* R. 32–33), and Cody notably does not dispute it.

Cody argues that the ALJ impermissibly required Cody to substantiate his subjective complaints of pain and fatigue with objective medical evidence. *See Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 96 (4th Cir. 2020) (noting that the ALJ "improperly increased [the claimant's] burden of proof by effectively requiring her subjective descriptions of her symptoms to be supported by objective medical evidence") (cleaned up). The ALJ simply did not. Rather, as recounted above, he noted that Cody's subjective complaints were inconsistent with his own medical records and other evidence.[10] In any event, "the ALJ is not required to defer to subjective complaints of pain if they are inconsistent with the available evidence." *Jennifer L. v. Kijakazi*, Case No. 7:20-cv-00442, 2022 WL 780417, at *3 (W.D. Va. Mar. 14, 2022). The ALJ gave adequate and sufficient reasons for his conclusion, and those reasons are supported by substantial evidence.

Finally, Cody argues that the ALJ improperly considered his activities of daily living without considering the extent to which he performs them. *See Woods*, 888 F.3d at 694 ("An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." (emphasis in original). But Cody's argument misunderstands the ALJ's conclusion. The ALJ did not cite Cody's activities of daily living as evidence that he could perform for a full workweek. (*See* Pl.'s Br. Supp. Mot. Summ. J. at 43 ("'[T]he ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability' to work full-time." (quoting *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003)).) Rather, the ALJ cited those activities as evidence for

---

[10] It is worth noting that *Arakas* dealt with fibromyalgia, a disorder that notably "do[es] not produce objective medical evidence." *Willa F. v. Kijakazi*, No. ADC-20-2659, 2021 WL 5167018, at *7 (D. Md. Nov. 5, 2021).

- 39 -

purposes of a credibility determination, "not as examples of the functions [Cody] could perform for an entire day." *Ladda*, 749 F. App'x at 173 n.4. This conclusion is buttressed by the fact that the ALJ cited evidence that Cody "occasionally" spends time with family and friends as evidence that, during a workday, he could "occasionally" interact with others. (*See* R. 26.)

After a thorough review of the record, the court finds that the ALJ's treatment of Cody's subjective complaints complied with the applicable law, his conclusions are supported by substantial evidence, and his written decision drew an "accurate and logical bridge" between that evidence and his conclusions. Cody's motion for summary judgment, therefore, will be denied. *See Monroe*, 826 F.3d at 189 (quoting *Clifford*, 227 F.3d at 872).

## IV.   CONCLUSION

It is worth noting that, in Cody's 46-page brief, he does not contend that the ALJ applied the wrong legal standard, nor does he dispute the accuracy of the medical record cited by the ALJ. Rather, his arguments almost universally challenge whether substantial evidence supports the ALJ's conclusions. The court recognizes that reasonable, well-meaning people can—and often do—differ over whether an individual is entitled to disability benefits, and the issue is no doubt of vital importance to Cody. But a thorough review of the record establishes that substantial evidence supports each of the ALJ's conclusions. The court makes no judgment on whether those conclusions are correct, only that they are supportable as required by law. That is the extent of the court's limited role, so Cody's motion for summary judgment will be denied.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 25th day of March, 2024.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE